# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CRAIG ALLEN PHELPS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | Case No. CIV-23-755-F |
| | ) | |
| DANIEL HOLLIMAN and TOWN | ) | |
| OF DIBBLE, OKLAHOMA, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER</u>

Plaintiff Craig Allen Phelps ("Phelps") commenced this action seeking to recover damages under 42 U.S.C. § 1983 based on claims of (1) use of excessive force in violation of the Fourth and Fourteenth Amendments, (2) retaliation in violation of the First Amendment, and (3) municipal liability. In addition, Phelps sought to recover damages under Oklahoma law based on negligence. The court, upon motion, previously dismissed the municipal liability claim under Rule 12(b)(6), Fed. R. Civ. P. *See*, doc. no. 15.

Defendants Daniel Holliman ("Holliman") and Town of Dibble, Oklahoma ("the Town") have now moved for summary judgment, under Rule 56(a), Fed. R. Civ. P., on Phelps' remaining claims. *See*, doc. nos. 32 and 33. In his motion, Holliman specifically asserts that he is entitled to qualified immunity.[1] Phelps has

---

[1] Holliman raised the affirmative defense of qualified immunity in his answer to Phelps' complaint. *See*, doc. no. 12, ECF p. 4, ¶ 10. "Persons sued under § 1983 in their individual capacity may invoke the defense of qualified immunity." <u>Duda v. Elder</u>, 7 F.4th 899, 909 (10th Cir. 2021). Qualified immunity "protects government officials from liability for civil damages insofar as their

responded in opposition to both motions. *See*, doc. nos. 43 and 45. Defendants have replied. *See,* doc. nos. 48 and 49. Upon review of the parties' submissions and the applicable law, the court makes its determination.

I.

*Background*[2]

1. <u>The Incident at the Dibble Police Department</u>

At approximately 2:00 p.m. on March 16, 2022, Phelps was arrested without a warrant by Jessica Dobbs (Dobbs), an officer with the Dibble Police Department (DPD), for possession of marijuana. Doc. no. 32-7, 14:26-14:29. As Phelps recalled, he was arrested for "burning on [his] land." Doc. no. 43-2, ECF p. 2, l. 11. Dobbs transported Phelps to the DPD. At the time, Phelps was not wearing a shirt.

Upon arrival at the DPD, Phelps was placed on a bench and handcuffed to wall-mount handcuff rings. Using only his feet, Phelps took off his tennis shoes and socks, leaving him barefoot.

Although the DPD offense report referred to both city and state offenses, a decision was made to charge Phelps only with municipal code violations. Ultimately, no state charges were pursued (and the record does not clearly show the actual disposition of the municipal code violations).

Holliman was an officer with the DPD. He was present at the DPD station when Phelps arrived there. During all relevant times, Dobbs and Holliman wore body cameras. The DPD also had a stationary video camera. Video footage of the

---

conduct does not violate clearly established statutory or constitutional rights[.]" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quotation marks and citation omitted).

[2] The court, as required, takes "'all the facts in the light most favorable to'" Phelps. <u>Jordan v. Jenkins</u>, 73 F.4th 1162, 1171 (10th Cir. 2023) (quoting <u>Emmett v. Armstrong</u>, 973 F.3d 1127, 1135 (10th Cir. 2020)). "[T]his generally means adopting the plaintiff's version of the facts[.]" <u>Palacios v. Fortuna</u>, 61 F.4th 1248, 1256 (10th Cir. 2023). However, the court does not "have to accept versions of the facts contradicted by objective evidence, such as video surveillance footage." *Id.* (quotation marks and citation omitted).

2

events, and transcriptions of statements made by Holliman, Dobbs, and Phelps are in the summary judgment record. Doc. nos. 32-5, 6, 7, 8, 9, 10, 11, 12, 16, 21, 22, and 24.

The bench on which Phelps was detained was in a room where Dobbs and Holliman had their desks. Dobbs' desk was visible from the bench. Holliman's desk was not. Holliman's desk was next to the building's exterior door, which provided access to the station's parking lot. Phelps had entered the DPD through that door. After Phelps was restrained on the bench, the exterior door was opened by Dobbs and another unidentified individual. It remained open. While restrained on the bench, Phelps talked to himself, Dobbs, the unidentified individual, and Holliman.

At one point, Holliman informed Dobbs that Phelps' mom had said she would be at the station in 30 minutes. Thereafter, Holliman told Phelps that they were waiting for his mom, and if she could bail him out, they would let him go. If not, he had to go to "Grady." Doc. no. 32-9, ECF p. 13, ll. 19-20, 24-25, ECF p. 14, l. 2.

Because Dobbs was going off duty and money was not timely received from Phelps' family, Holliman was tasked with transporting Phelps to the Grady County Jail. The Town housed arrestees with municipal charges at that jail. Phelps had been "pretty confident" his family was going to deliver the required money, and he was going to leave the DPD. He was "extremely disappointed" when that didn't happen. Doc. no. 43-2, ECF p. 5, ll. 1-3.

Holliman approached Phelps, who was lying down on the bench, and began uncuffing him from the wall-mount handcuff rings. They had the following exchange:

Holliman: ". . . we're going to get up."

Phelps: "Oh, God, don't hit me."

Holliman: "I'm not going to hit you."

Phelps: "Son of a bitch."

Holliman: "I'm not going to hit you."

Phelps: "But, I'm saying, like, can you call her right now, and you're like, no dude, I will do it at my own leisure and time[.]"

Holliman: "Because I'm the police, okay[.]"

Phelps: "Right. I get that."

Holliman: "-- and you're in our custody . . . We don't do stuff on the time frame that you want it done on."

Phelps: "Right, I get that, but dig it, man, look at it from my perspective, though. Man, I respect you."

Doc. no. 32-6, ECF p. 2, ll. 14-25, ECF p. 3, ll. 1-4; doc. no. 32-5; doc. no. 32-11.

Holliman told Phelps to "[h]op up" for him, and Phelps complied. Holliman began handcuffing Phelps behind his back. He had Phelps "[h]op up" again. Doc. no. 32-6, ll. 5, 15; doc. no. 32-5; doc. no. 32-11. Phelps stood up, and Holliman finished handcuffing him. During this time, they had the following exchange:

Phelps: "You know what I mean? So, if I ask you to make a phone call for me, that means right now. Your boss asks you to go make a phone call, you . . . You -- you'd get on the phone right now, wouldn't you?"

Holliman: "Okay. You don't call the shots."

Phelps: "But you would if your boss asked you."

Holliman: "You don't call -- yeah, my boss is my boss."

Phelps: (laughs) "Point taken, but that's what I'm saying . . . I'm used to people doing what I say."

Holliman: "Well, you don't have the control around here, man."

Phelps: "I bet you I would if it was just me and you."

4

Holliman: "I bet you, you wouldn't . . . That'd be the worst mistake of your life."

Phelps: (laughing) "I bet you I would.  "I'd --"

Holliman: "You've had -- you've had chances before."

Phelps: "Oh, I'm just saying man -- (laughs) -- don't get all -- don't get all upset, either.  Hey, I'm not even trying to make light of it."

***

Phelps: "So, where's my Mom at?

Holliman: ". . .  I don't know.  She said she was going to be here in thirty minutes."

Phelps: "Why are you lying (phonetic)?  I thought we were cool, man.  This ain't making me feel like we're very cool."

 Holliman: "Well, man, you're the one that started talking all that mess."

Phelps: "Well, you're the one who evaded my question."

Holliman: "I told you how --"

Phelps:  "And I apologized --"

Holliman: "-- it was going to be."

Phelps: "Oh. Oh. Yeah?"

Holliman: "Uh-huh (indicating affirmatively).  There we go.  Is that tight?  Not like it could be."

Phelps: "No, that's good, thanks.  But yeah, man, I was just like, why?  Shit. I know you ain't no (unintelligible) and I know you're not a punk, I'm not talking to you like no punk."

Doc. no. 32-6, ECF p. 3, ll. 6-23, ECF p. 4, ll. 1-22; doc. no. 32-5; doc. no. 32-11.

Holliman asked Phelps to sit down on the bench.  Phelps complied.  They had the following exchange:

Phelps: ". . . all due respect, man. I really just -- I'm fucking at a[] point right now, dude. I don't fucking want to live anymore, man, if I can't get some answers. Or get somebody to be on my side. I don't have anybody on my side. Do I?"

Holliman: "Dude --"

Phelps: "Look at my face . . . I was punched in my sleep, dude, and it's like -- God, I can't even go to sleep when I want now, man."

Holliman: "You would have more people on your side if you weren't confrontational with everybody."

Phelps: "Bro -- dude -- I'm a dangerous motherfucker, but I'm not going to attack you."

Holliman: "Okay."

Phelps: "Why don't you people understand that?"

Holliman: "Okay."

Phelps: "Why can't somebody be eccentric and not be --"

Holliman: "Just sit there for me, okay?"

Phelps: "-- and not be violent, physically? Why, though, Holliman? . . ."

Doc. no. 32-6, ECF p. 4, ll. 23-25, ECF p. 5, ll. 1-5, 7-19; doc. no. 32-5; doc. no. 32-11.

Holliman walked to an interior door in the DPD, which was a short distance from the bench, and opened it. Phelps stood up. Holliman told him to sit down. The following exchange occurred:

Phelps: "Okay, I will. But why, Holliman? Why can't somebody just be like stupid and yelling and shit all the time?

Holliman: "Because that's not how society works."

Phelps: "Yeah, but would you rather me be that or me attacking you with no words."

6

Holliman: "Okay. That's not how society works."

Phelps: "Right -- well, ideally, I'd want people screaming at the top of their lungs because, hey, life, liberty, and the pursuit of happiness, right? Even if it's screaming at the top of your lungs."

Doc. no. 32-6, ECF p. 5, ll. 21-25, p. ECF p. 6, ll. 1-5; doc. no. 32-5; doc. no. 32-11.

Holliman, still holding the interior door open, called for Dobbs. Phelps continued talking to him. He asked Holliman if he could stand, and he approached Holliman. Holliman put his right arm and hand up and told Phelps to step back, and Phelps continued to approach. Holliman told him to step back again. Phelps said "Okay. But I've never attacked anybody." Doc. no. 32-6, ECF p. 7, l. 4.; doc. no. 32-5; doc. no. 32-11. He sat back down on the bench.

Dobbs came back into the area. Holliman walked away from the door, which closed behind him. Phelps sat back on the bench. Dobbs gave Holliman Phelps' phone and municipal hold papers. She also put Phelps' tennis shoes and socks in a paper bag. Thereafter, she took Phelps' phone from Holliman and put it in the paper bag. During this time, Phelps continued talking, stating:

Phelps: ". . . I've actually been in a lot of fights. I've fucking hurt some people, you know what I mean . . . When they put their hands on me . . . You know, that  -- that's always how it started with my brother years ago. He would attack me and then I would, you know, fight him back and he would be injured . . . I mean, I know what you're saying, man. I'm a good soul. I'm nothing to be afraid of, man. I would kick somebody out from underneath you. Truth be told . . . I'd be that one motherfucker that would help you. I would, man, and I'm -- and I have been -- you ask my . . . grandma what I've been doing and what I do every day for the past year. I don't have no circle of friends or nothing, and you guys are my own fucking enemies . . . []."

Holliman: "I'm not your enemy."

Phelps: "No, that's what I mean.  I made you guys that way, you know what I mean?"

Holliman: "Yeah."

Doc. no. 32-6, ECF p. 7, ll.7-9, 15-18, 21-23, ECF p. 8, ll. 1-2, 5-12.

Holliman approached Phelps, and he asked him to "[h]op up" for him.

Holliman and Phelps then had following exchange:

Phelps: "And I'm glad we had that talk.  Where we going?"

Holliman: "So, we're going to Grady County right now, okay?  Because your Mom hasn't shown up yet or anything like that."

Then, gripping Phelps' right arm with his left hand, Holliman guided Phelps toward the door. Dobbs stood near her desk with the paper bag containing Phelps' personal items.

Doc. no. 32-6, ECF p. 8, ll. 16-20; doc. no. 32-5; doc. no. 32-11.

## The first takedown

As Holliman and Phelps walked toward the door:

Phelps: "Let me get this water right here."

Holliman: "Huh?"

Doc. no. 32-6, ECF p. 8, ll. 21-22; doc. no. 32-5; doc. no. 32-11.

Holliman pulled Phelps back.  Phelps, looking at a row of blue lockers near the door, said, "[h]old on."

Holliman: "No."

Phelps: "I've got my water."

Doc. no. 32-6, ECF p. 8, ll. 23-25; doc. no. 32-5; doc. no. 32-11.[3]

---

[3] Phelps testified in deposition that he "was extremely thirsty."  Doc. no. 43-2, ECF p. 12, l. 7.

Phelps then lunged toward the blue lockers.[4]  Holliman went with Phelps toward the blue lockers.  Phelps hit the blue lockers with his head.



**Phelps hits the lockers with his head.**
Doc. no. 32-8 at 48:17.

With both of Holliman's hands on Phelps' right arm, Holliman placed his right leg and foot in front of Phelps' right leg and foot and propelled Phelps' head to the wood floor.  Phelps hit the floor head first.  Doc. no. 32-11.  Holliman refers to the maneuver as a "hip toss."  Doc. no. 32, ECF p. 11, ECF p. 15, ¶ 16.

---

[4] Footage from Holliman's body worn camera does not show any bottled water or any other source of water in any of the open shelves of the cabinet or near the blue lockers.  *See*, doc. no. 32-5; *see also*, doc. no. 32-14.

9



**The hip toss.**
Doc. no. 32-8 at 48:19.

Holliman also went to the floor with Phelps, falling on his right side. Holliman then got on top of Phelps and drove Phelps' head and neck to the floor with the point of his right elbow–backed by the weight of his upper body.  Doc. no. 32-11.

Phelps' face struck the floor, splitting his chin split open.  Emergency services were called.  A few minutes later while lying on the floor, Phelps stated: "I just wanted to hit my head on the wall. . . I just wanted to hit my head."  Doc. no. 32-6, ECF p. 10, ll. 6-8.

Phelps was transported to Norman Regional Hospital for medical treatment. Holliman followed Phelps to the hospital.  Phelps complained of his laceration to his

chin, a headache, and knee pain.  He reported a loss of consciousness.  At the hospital, the wound to Phelps' chin was treated.  Medical personnel determined that Phelps had a "nondisplaced fracture of the [] nasal spine with some extension along the root" but "no instability."  Doc. no. 32-18, ECF p. 9.  Phelps testified in deposition a bone under the corner of his right eye "was broken."  Doc. no. 43-2, ECF p. 6, ll. 23-25, ECF p. 7, ll. 1-3.  Phelps also lost "three front teeth."  *Id*., ECF p. 7, l. 5.

2.  <u>The Incident Outside Norman Regional Hospital</u>

Holliman was responsible for transporting Phelps to jail after his receipt of medical treatment.  Again, Holliman wore a body camera.   Phelps was lying on the hospital bed and the following exchange occurred:

Holliman: "Okay.  Hop up."

Phelps: "Violence?  Is that – is that what you're going to do?"

Holliman: "No, you're getting the cuffs behind your back."

Phelps: "Oh, yay!  Thank you!  You're still fucking retarded."

Holliman: "All right.  Hop up."

Phelps: (laughs) "You know that?"

Holliman: "Un-huh" (indicating affirmatively).

Phelps stood up and Holliman handcuffed Phelps' hands behind his back.

Phelps: "That's so funny.  I bet you just can't keep your fucking hands off me. You fucking fag.  I'm pretty fucking hot (phonetic), I get it."

Holliman: "All right.  Have a seat."

Doc. no. 32-21, ECF p. 3, ll. 7-17; doc. no. 32-16.

Phelps sat back down on the hospital bed.  The following exchange occurred:

Phelps: "You fucking stinking pile of shit. Oh, you need to go to jail, dude. You unprovoked fucking attacked me. You will lose your badge. Yeah, and when you do, I'll be waiting there, too. I'll smash you."

Nurse: "Can I go over a few things with you, brother?"

Holliman: "Yep."

Phelps: "Yeah, please, I'd rather not."

Nurse: "You don't want to -- you don't want to know?"

Phelps: "No, and I don't want you to say nothing to me or him in front of me --"

Nurse: "Okay."

Phelps: "-- about me around this motherfucker."

Nurse: "Okay. Well --"

Phelps: "So, yeah, and no offense, but this motherfucker ain't seen the last of me. Its -- yeah, he's going to be in court, you're going to lose your job -- hey, fuck you all the way home, home -- home-boy. You made the best motherfucking --"

Holliman: "Well, I'll be going home to my family, and you'll be going to jail is that all -- is that all --"

Phelps: "Yeah, I bet you I'm out tonight. I bet you I'm out tonight, ho." (laughs)

Doc. no. 32-21, ECF p. 3, ll. 18-25, ECF p. 4, ll.1-14; doc. no. 32-16.

Holliman grabbed Phelps by the left arm with his right arm and the nurse gave Holliman some papers.

Phelps continued:

"I'm very -- I'm in a lot of -- I'm in a lot of danger right now. That's all I care about. But, yeah after you lose your fucking job --"

Doc. no. 32-21, ECF p. 4, ll. 16-18; doc. no. 32-16.

Holliman handed something to the nurse and asked her to give it to "them behind the counter."  Doc. no. 32-21, ECF p. 4, l. 19; doc. no. 32-16.  The nurse said she would.

Holliman escorted Phelps out the door of the hospital room, holding his left arm with his right hand.  Holliman held some papers in his left hand.  Phelps said he had some shoes and the nurse responded, "[o]h, all right."  Doc. no. 32-21, ECF p. 4, l. 25, ECF p. 5, l. 1; doc. no. 32-16.

### The second takedown

Holliman began to escort Phelps away from the hospital room.  They stopped.  The following exchange occurred:

Holliman: "All right.  Hey, like, right here, right now --"

Phelps: "You going to hit me?"

Holliman: "-- if you want to play stupid again, we can go.  Okay?  If not, let's walk."

Doc. no. 32-21, ECF p. 5, ll. 3-6; doc. no. 32-16.

Holliman and Phelps continued to walk in order to exit the hospital.  The following exchange occurred:

Phelps: "No. Oh, wow.  Look at you.  You're so -- freakin' (unintelligible)."

Phelps: "Are you trying to pick me up and push me around?  Really?  Dude, look at my face."

Holliman: "Go."

Phelps: "You know I could manhandle you if I wanted to."

Phelps: "Really, you're pushing me around?"

Doc. no. 32-21, ECF p. 5, ll. 7-12; doc. no. 32-16.

Holliman and Phelps reached the two hospital exit doors.  Holliman pushed the button to automatically open them.

Phelps: "Really?  Like --"

Doc. no. 32-21, ECF p. 5, l. 12; doc. no. 32-16.

Holliman and Phelps proceeded to walk out the first exit door.  Something occurred to cause Holliman's body camera to fall off.  He picked the camera up and held it in his left hand.  The following exchange occurred:

Phelps: "Okay, okay.  I get it -- whoa --"

Holliman: "We're done."

Phelps: Whoa, hey!"

Holliman: "We're done."

Phelps: "What are you doing?  Okay.  You can't slam me now, can you?  I'm just saying.  You can't do it now, can't manhandle me."

Doc. no. 32-21, ECF p. 5, ll. 14-20; doc. no. 32-16.

Holliman and Phelps walked out the second exit door and into the parking lot. Holliman continued to hold the body camera in his hand.  The following exchange occurred:

Phelps: "Man, why you do this to me?  HELP!  HELP!"

Holliman: "Go."

Phelps: "HELP! HELP! . . . HELP!"

Holliman: "Go."

Phelps: "HELP!"

Holliman: "Go!"

Phelps: "You're weak."

Doc. no. 32-21, ECF p. 5, ll. 20-25, ECF p. 6, ll. 1-2; doc. no. 32-16.

Holliman took Phelps to the ground, lying on his back.

Phelps: "Ow, ow, ow.  I get it.  I'd trip me, too."

Holliman: "Stop."

14

Phelps: HELP! Okay, please don't hit me."

Doc. no. 32-21, ECF p. 6, ll. 4-6; doc. no. 32-16.

The hospital's surveillance camera of the outside area and parking lot, which did not have audio, doc. no. 32-24, starting at 00:12 and ending at 00:24, showed Holliman walking with Phelps. Holliman was walking beside Phelps with his right hand placed through Phelps' left arm and holding Phelps' left shoulder. Holliman's left hand was holding papers. Phelps stopped and turned right, away from Holliman. Using both hands on Phelps' shoulders, Holliman turned Phelps back to walk forward. Phelps took some steps and again turned to the right and looked back. Phelps' mouth was open wide as if he was yelling. Using his body and hands, Holliman turned Phelps back around to walk forward and Phelps began resisting. Shortly thereafter, Phelps moved away from Holliman, and Holliman placed his right leg behind Phelps' left knee with a sweeping motion, taking Phelps to the ground. Doc. no. 32-24 at 00:24.

Holliman refers to the maneuver he performed on Phelps as a "leg sweep." Doc. no. 32, ECF p. 11, ECF p. 18, ¶ 35.

After Phelps was taken to the ground, a nurse asked Holliman if he needed security, and he responded affirmatively. The nurse called for security. Phelps yelled several times that he did not want to "nowhere" with Holliman. Doc. no. 32-21, ECF p. 6, ll. 10, 15, 17. Holliman told Phelps he was going to jail. Security assistance arrived. Phelps told security he did not want to go with Holliman and asked one of the officers to go with them. The security officer told Phelps he had to go with Holliman. A security officer then helped Holliman take Phelps to the police car. Doc. no. 32-24. The other security officer, along with a nurse carrying papers, followed. It took the security officer and Holliman, one on each side, to get Phelps

into the vehicle without further incident.  *Id*.  Holliman then transported Phelps to the jail.

3. <u>Additional Facts</u>

Holliman did not indicate in his incident report that Phelps was handcuffed at the time of either use of force.  He also stated in the report that at the DPD, Phelps became "agitated and aggressive."  He tried to pull away from him "wildly swinging his arms and made a dash towards our supply cabinets and evidence lockers."  Doc. no. 43-5.

Holliman testified in deposition that after the incidents, "Stowell" who later became "Chief Stowell" told him that "looking at it from a handcuffed suspect, the optics could look bad."  Doc. no. 43-4, ECF p. 14, ll. 17-18.

Phelps was bonded out of jail about three days after the incidents with Holliman.  Doc. no. 43-2, ECF p. 7, ll. 15-22.  In the exercise of "prosecution discretion," no state charges were filed.  Doc. no.  43-6.

Over a year later, Phelps commenced this action.  In his complaint, Phelps claims that Holliman, at the DPD and outside Norman Regional Hospital, used excessive force against him in violation of the Fourth and Fourteenth Amendments, and that Holliman retaliated against him in violation of the First Amendment by using excessive force in response to Phelps criticizing Holliman's conduct.  Phelps seeks to recover damages against Holliman under § 1983.  Phelps also seeks to recover damages against the Town under Oklahoma law, claiming Holliman, the Town's employee, was negligent in the use of excessive force.

II.

*Legal Standard*

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule

56(a), Fed. R. Civ. P. "A disputed fact is material if it might affect the outcome of the suit under the governing law[.]" Palacios, 61 F.4th at 1256 (quotation marks and citation omitted). On summary judgment, the court construes "the facts in the light most favorable to the nonmovant and [] draw[s] all reasonable inferences in [his] favor." *Id*. And as noted, in qualified immunity cases, this generally means adopting plaintiff's version of the facts, unless the facts are contradicted by objective evidence, such as video surveillance footage. *Id*.

As stated, Holliman moves for summary judgment asserting the affirmative defense of qualified immunity as to Phelps' § 1983 claims. "When a defendant asserts qualified immunity in a summary judgment motion, the plaintiff must show that (1) a reasonable jury could find facts supporting a violation of a constitutional right and (2) the right was clearly established at the time of the violation." Wilkins v. City of Tulsa, Oklahoma, 33 F.4th 1265, 1272 (10th Cir. 2022).

"'A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" Wilkins, 33 F.4th at 1272 (quoting Mullenix v. Luna, 577 U.S. 7, 11 (2015) (per curiam)). "'Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.'" Morris v. Noe, 672 F.3d 1185, 1196 (10th Cir. 2012) (quoting Klen v. City of Loveland, Colo., 661 F.3d 498, 511 (10th Cir. 2011)). "Because the existence of excessive force is a fact-specific inquiry, however, 'there will almost never be a previously published opinion involving exactly the same circumstances.'" *Id*. (quoting Casey v. City of Federal Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)). Thus, the Tenth Circuit "has adopted a sliding scale: 'The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is

required from prior case law to clearly establish the violation.'"  *Id*. (quoting <u>Pierce</u> <u>v. Gilchrist</u>, 359 F.3d 1279, 1298 (10th Cir. 2004)).

In <u>Lowe v. Raemisch</u>, 864 F.3d 1205 (10th Cir. 2017), the Tenth Circuit stated that the "sliding-scale approach may arguably conflict with recent Supreme Court precedent on qualified immunity" because this approach may allow the court to "find a clearly established right even when a precedent is neither on point nor obviously applicable."  *Id*. at 1211 n. 10.  However, the Tenth Circuit declined to decide whether the sliding-scale approach conflicts with Supreme Court precedent.  *Id*. Although the sliding-scale approach "may arguably conflict" with Supreme Court precedent, the Tenth Circuit has not overruled it.  Consequently, the court concludes that it still applies.  *See*, <u>Contreras on behalf of A.L. v. Dona Ana County Board of</u> <u>County Commissioners</u>, 965 F.3d 1114, 1135 (10th Cir. 2020) (per curiam) (Baldock, J. concurring in part and dissenting in part) ("Until either this Court or the Supreme Court sounds the death knell for our sliding-scale approach, we are bound to apply it rather than merely pay lip service to it.").

Nonetheless, the court notes that in <u>Lowe</u>, the Tenth Circuit also stated that "[e]ven when no precedent involves facts 'materially similar" [], the right can be clearly established if a precedent applies with 'obvious clarity.'. . .When the public official's conduct is egregious, even a general precedent would apply with obvious clarity."  <u>Lowe</u>, 864 F.3d at 1210 (citation and quotation omitted).  More recently, in <u>Shepherd v. Robbins</u>, 55 F.4[th] 810 (10th Cir. 2022), the court noted the two approaches without getting into a discussion of the difference that application of one or the other might have made in that case:

> Plaintiff argues that the "sliding scale" approach should apply to show that the unlawfulness of Defendant's conduct was apparent. Our more recent jurisprudence has shifted to consider "obvious clarity" or "flagrantly unlawful conduct" rather than engage in the sliding scale approach. See <u>Lowe v. Raemisch</u>, 864 F.3d 1205, 1210–11, 1211 n.10

(10th Cir. 2017); <u>Contreras v. Doña Ana Cnty. Bd. of Cnty. Comm'rs</u>, 965 F.3d 1114, 1123 (10th Cir. 2020) (Carson, J., Concurring).

*Id.* at 818 n.5.

As is discussed below, where this order addresses the issue of clearly-established law with respect to the "hip toss" maneuver, the sliding-scale approach requires less factual specificity in the pre-existing case law where the conduct in question tends toward the egregious end of the scale.  At least in the context of the case at bar, a search for "obvious clarity" or "flagrantly unlawful conduct" would not yield a result different from that which follows from application of a sliding-scale approach.

## III.

### *Analysis*

<u>Use of Excessive Force Claim – Fourth Amendment</u>

Although Holliman argues in briefing the Fourteenth Amendment applies to Phelps' excessive force claim, the court concludes that the Fourth Amendment applies.  Under Tenth Circuit precedent, the Fourth Amendment applies to a person arrested and detained without a warrant and prior to any probable cause hearing. *See*, <u>Estate of Booker v. Gomez</u>, 745 F.3d 405, 419 (10th Cir. 2014); <u>Austin v. Hamilton</u>, 945 F.2d 1155, 1160 (10th Cir. 1991), *abrogated on other grounds by* <u>Johnson v. Jones</u>, 515 U.S. 304 (1995).  At the time of Holliman's alleged uses of excessive force, Phelps had been arrested and detained without a warrant, but no probable cause hearing had occurred.  Therefore, "the federal right at issue is the Fourth Amendment right against unreasonable seizures." <u>Wilkins</u>, 33 F.4th at 1273.

In evaluating a claim of excessive force under the Fourth Amendment, the court must consider whether the officer's actions "'are "objectively reasonable" in light of the facts and circumstances'" confronting him. <u>Wilkins</u>, 33 F.4th at 1273 (quoting <u>Lombardo v. City of St. Louis, Missouri</u>, 594 U.S. 464, 466 (2021) (per

curiam) (quoting <u>Graham v. Connor</u>, 490 U.S. 386, 397 (1989)). To assess objective reasonableness, the court must evaluate "whether the totality of the circumstances justified the use of force, as 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Id*. (quoting <u>Graham</u>, 490 U.S. at 396).

The Supreme Court in <u>Graham v. Connor</u> identified three non-exclusive factors to evaluate whether a use of force was excessive: (1) "the severity of the crime at issue," (2) "whether the suspect poses an immediate threat to the safety of the officers or others," and (3) "whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Graham</u>, 490 U.S. at 396.

As to the first <u>Graham</u> factor, the Tenth Circuit has stated that "a minor offense supports only the use of minimal force." <u>Wilkins</u>, 33 F.4th at 1273 (citing <u>Perea v. Baca</u>, 817 F.3d 1198, 1203 (10th Cir. 2016)); *see also*, <u>McWilliams v. Dinapoli</u>, 40 F.4th 1118, 1125 (10th Cir. 2022) ("Because the suspected offense was minor, this factor would 'support[] only the use of minimal force.'") (quoting <u>Wilkins</u>, 33 F.4th at 1273).

According to the Tenth Circuit, the second <u>Graham</u> factor is "'undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force.'" <u>Wilkins</u>, 33 F.4th at 1273 (quoting <u>Pauly v. White</u>, 874 F.3d 1197, 1215-16 (10th Cir. 2017)). In evaluating this factor, the court "'must look at whether the officers or others were in danger at the precise moment that they used force.'" *Id*. (quoting <u>Emmett</u>, 973 F.3d at 1136).[5]

---

[5] On October 4, 2024, the Supreme Court granted certiorari in a case presenting the question of "[w]hether courts should apply the moment of the threat doctrine when evaluating an excessive force claim under the Fourth Amendment." Petition for a Writ of Certiorari, <u>Janice Hughes Baenes, Individually and as Representative of the Estate of Ashtian Barnes, Deceased, Petitioner, v. Roberto Felix, Jr.; Cnty. of Harris, Texas, Respondents</u>, no. 23-1239, 2024 WL 2728079, at *i,

With respect to the third <u>Graham</u> factor, the court must evaluate "'whether the suspect attempted to flee or actively resisted the arrest or search.'" <u>Wilkins</u>, 33 F.4th at 1273 (quoting <u>Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.</u>, 864 F.3d 1154, 1191 (10th Cir. 2017)) (alteration omitted). Like the second <u>Graham</u> factor, the court must consider "whether the plaintiff was fleeing or actively resisting at the 'precise moment' the officer employed the challenged use[] of force." <u>Vette v. K-9 Unit Deputy Sanders</u>, 989 F.3d 1154, 1171 (10th Cir. 2021).

1. <u>Whether Holliman violated Phelps' Fourth Amendment rights by using the "hip toss" maneuver in the DPD</u>

*a. Severity of the Crime*

The first <u>Graham</u> factor–severity of the crime at issue–weighs in Phelps' favor. When Holliman performed the "hip toss" maneuver against Phelps in the DPD, Phelps was being detained and was to be transported to the Grady County Jail because of municipal code violations. The municipal charges were clearly minor offenses. As such, they only warranted the use of "minimal" force. <u>Wilkins</u>, 33 F.4th at 1273. Common sense tells us that the bounds of "minimal force" will vary, depending on what, exactly, is going on between the officer and the arrestee. Here, Phelps certainly invited the application of some degree of force when he decided to detour toward the lockers so he could bang his head against them. But a jury could reasonably find that what Holliman actually did, in the circumstances confronting him, cannot be called "minimal" force.

---

*cert. granted*, 2024 WL 4394125, Oct. 4, 2024. The Court heard oral argument in <u>Baenes</u> on January 22, 2025. In this order, consistent with Tenth Circuit precedent, the court evaluates the uses of force complained of by Phelps on the basis of the facts existing at the "precise moment" of the uses of force. That said, the court quite readily observes that the conclusions reached in this order would be the same regardless of how far back (or, for that matter, forward) we might go in marshaling the operative facts.

### b. *Threat to Holliman or Others*

The second <u>Graham</u> factor–whether the suspect poses an immediate threat to the safety of the officers or others–also weighs in Phelps' favor. The Tenth Circuit has stated that "[u]nder the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officers or others." <u>Donahue v. Wihongi</u>, 948 F.3d 1177, 1196 (10th Cir. 2020). There is no evidence of that sort of conduct in this case.

The video surveillance footage shows that while Dobbs, Holliman, and Phelps were waiting for Phelps' mother to arrive with money, Phelps was docile at times, but, at other times, he was, in the vernacular, loud and obnoxious. Although he complied with some commands, he was frequently profane, leveling a steady stream of invective at Holliman. At times, Phelps' comments clearly suggested that he was emotionally distraught.

But the video footage also shows that at the time he was to be transported to the Grady County Jail, Phelps was unarmed and in handcuffs. His arms were securely restrained behind his back. He was also in the controlled setting of a police station, with another armed officer a few feet away. At the precise moment that Holliman performed the "hip toss" maneuver, Phelps made no verbal threats or aggressive moves toward Holliman or anyone else. His arms also were not "wildly swinging" and was not "dash[ing]" toward the metal cabinet and row of lockers as Holliman reported. As for commands, Phelps did not comply when Holliman said "No," to Phelps' statement about getting water. But Holliman did not instruct Phelps or warn him to stop his conduct. The fact that Phelps wanted to, and did, bang his head against the lockers did not expose Holliman to a life-threatening situation (or anything close to that) which would have justified strong action to neutralize the threat.

The court concludes that the evidence, viewed in Phelps' favor, does not show that Phelps posed an immediate threat to Holliman or others.

### c. Actively Resisting or Attempting to Flee

The third Graham factor–whether Phelps actively resisted arrest or attempted to evade arrest by flight–also weighs in favor of Phelps. There is no evidence to suggest that Phelps was attempting to evade arrest by flight. Phelps had moved forward walking toward the metal cabinet and then the row of blue lockers which were near the interior door. He stated he wanted to get water. Although there was the exterior door to the parking lot that was open, the door was 20 or 30 feet away (behind Holliman and Phelps, with an armed officer (Dobbs) between Phelps and that door). Phelps made no move toward that door. He lunged at the row of blue lockers.

As to whether Phelps "actively resisted arrest," the record shows that Phelps had been arrested and detained for a couple of hours prior to the "hip toss" maneuver. Thus, he was not actively resisting arrest at the precise moment Holliman applied the "hip toss" maneuver.

Nonetheless, the court recognizes that when evaluating the third Graham factor, the Tenth Circuit has quite sensibly told us to "consider any resistance during the suspect's encounter with officers." Wilkins, 33 F.4th at 1273; see also, Geddes v. Weber County, 2022 WL 3371010, at *17 (10th Cir. Aug. 16, 2022) (Bacharach, J., dissenting) (adjusting the third Graham factor to "the suspect's active resistance" in an excessive force case where plaintiff was being detained at a correctional facility prior to a probable cause hearing and plaintiff alleged jailers used excessive force against him when he failed to comply with a demand to remove his boots).

In this case, at the precise moment Holliman applied the "hip toss" maneuver, Phelps had reacted physically by lunging his body and head toward the row of blue

lockers.  He clearly intended to, and did, hit his head on the blue lockers.  The court, however, concludes that viewing the evidence in a light most favorable to Phelps, a reasonable jury could conclude that he was not "actively resisting" going to jail with Holliman.  Rather, a reasonable jury could conclude that all he wanted to do was injure himself.

Nonetheless, even if reasonable jury could conclude that Phelps' conduct constituted "active resistance" of going to jail, that conduct "weighs in favor of the use of *some* force during the period in which [Phelps] was resisting."  Perea, 817 F.3d at 1203 (emphasis in original).  "However, the relevant inquiry is whether the ["hip toss" maneuver] was reasonable and proportionate given [Phelps'] resistance."  *Id*.

The court concludes that a reasonable jury could conclude that Phelps' resistance did not justify Holliman's severe response.  Holliman responded to Phelps' lunge toward the blue lockers to hit his head by executing a "hip toss" maneuver, in which Holliman propelled Phelps' head to the floor.  Phelps hit the wood floor head first.  As Holliman was obviously aware when he executed the maneuver, Phelps was unable to protect his head (or any other body part) because he was handcuffed with his hands and arms securely restrained behind his back.[6] Holliman completed the maneuver by momentarily driving Phelps' head and neck to the floor with the point of his right elbow–backed by the weight of Holliman's upper body.

It bears repeating that this handling of an unarmed, handcuffed arrestee took place in the controlled setting of a police station, with another armed officer (Dobbs) a few feet away, and with no other actual or potential threats in the offing.  To be

---

[6] Thus, unlike the plaintiff in Jordan v. Jenkins, a § 1983 takedown case, Phelps was (as Holliman well knew) unable to "st[i]ck out his right arm to catch the ground."  Jordan, 73 F.4th at 1166.

sure, the situation was, for a few seconds, "tense, uncertain and rapidly evolving," Graham, 490 U.S. at 397, but the tension and uncertainty were not that of a dark night in a rough part of town, with any number of threats lurking in the shadows. The Fourth Amendment assuredly does not require a law enforcement officer to stay his hand if conditions are not conducive to a fair fight with an arrestee, but the required evaluation of the officer's choice of level of force is necessarily influenced by what the evidence shows as to the potential magnitude of the counterforce.

A jury could reasonably find (i) that Holliman could have regained full control of this handcuffed arrestee with the application of a much lower level of force, and (ii) that the force used in the "hip toss" maneuver was not reasonable and proportionate to the resistance inherent in Phelps' lunge away from Holliman and toward the blue lockers. Thus, the third Graham factor weighs against Holliman and in favor of Phelps. See, Perea, 817 F.3d at 1204 (third Graham factor weighs against officers where some force would be justified to get suspect under officers' control, but repeated use of the taser was not reasonable).

Because application of all three Graham factors favor Phelps, the court concludes that the "hip toss" maneuver was not objectively reasonable in light of the facts and circumstances confronting Holliman, and consequently constituted excessive force. From that it follows that Phelps was subjected to an unreasonable seizure under the Fourth Amendment. The court therefore concludes that with respect to the "hip toss" maneuver, Phelps has satisfied his burden under the first prong of the qualified immunity test–a reasonable jury could find facts supporting a violation of his Fourth Amendment right to be free from the use of excessive force.

2.   <u>Whether Holliman violated Phelps' Fourth Amendment rights by using the</u>
   <u>"leg sweep" maneuver outside the hospital</u>

*a. Severity of the Crime*

The first <u>Graham</u> factor–severity of the crime at issue–weighs in Phelps' favor.  When Holliman performed the "leg sweep" maneuver against Phelps outside the hospital, Phelps was being transported to jail because of municipal charges.  The municipal charges were minor offenses.  As such, they only warranted the use of "minimal" force. <u>Wilkins</u>, 33 F.4th at 1273.

*b.  Threat to Holliman or Others*

The second <u>Graham</u> factor–whether the suspect posed an immediate threat to the safety of the officers or others–also weighs in Phelps' favor.  As stated, "[u]nder the second factor, an officer may use increased force when a suspect is armed, repeatedly ignores police commands, or makes hostile motions towards the officers or others."  <u>Donahue</u>, 948 F.3d at 1196.

The video surveillance footage shows that as hospital staff prepared Phelps for discharge from the hospital, Phelps was again profane and verbally aggressive, taunting Holliman (which Holliman, at one point, returned in kind).  Doc. no. 32-16, at 1:56; doc. no. 32-21, ECF p. 4, ll. 11-12.

But the video surveillance footage also shows Phelps was unarmed and in handcuffs.  His arms were securely restrained behind his back.  Although Phelps had repeatedly ignored Holliman's repeated commands of "Go," at the precise moment that Holliman performed the "leg sweep" maneuver, Phelps was not making any verbal threats or aggressive moves toward Holliman or anyone else outside the hospital.  The evidence, viewed in Phelps' favor, does not support that Phelps posed an immediate threat to the safety of Holliman or others.

c. *Actively Resisting or Attempting to Flee*

The third <u>Graham</u> factor–whether Phelps actively resisted arrest or attempted to evade arrest by flight–weighs heavily in favor of Holliman.  The evidence, even viewed in Phelps' favor, shows that as Holliman escorted Phelps, in handcuffs, outside the hospital toward his patrol car, Phelps, with more than a little exertion, attempted to escape Holliman's control.  This was not the controlled confines of a police station, and Holliman had no backup immediately available.  In addition, Phelps was actively resisting, with the result that Holliman and Phelps struggled with each other on their feet for 12 seconds before Holliman settled the manner by executing a "leg sweep" maneuver, taking Phelps to the pavement on his back.  A little over two minutes later, after Phelps was on his feet, it took two men, one on each side, to get him to Holliman's vehicle without further incident.

 Phelps' active resistance outside the hospital clearly "weighs in favor of the use of *some* force during the period in which [Phelps] was resisting."  <u>Perea</u>, 817 F.3d at 1203 (emphasis in original).  However, as stated, "the relevant inquiry is whether the ["leg sweep" maneuver] was reasonable and proportionate given [Phelps'] resistance. *Id*.

The court concludes that no reasonable jury could conclude that the "leg sweep" maneuver was not reasonable and proportionate given Phelps' conduct.[7] Holliman was not able to control Phelps with the use of both his hands or his body. As stated, they were not in the confines of a police station, and they struggled with each other on their feet for 12 seconds before Holliman executed the "leg sweep"

---

[7] It is quite possible that, as Holliman and Phelps walked across the hospital parking lot toward Holliman's vehicle, Phelps' motivation to escape was rooted in fear of a recurrence of the level of violence Phelps had, a short time before, experienced at Holliman's hands at the police station. Plausible though that may be, the court is not aware of any authority for the proposition that when an arrestee seeks to escape lawful transport, the permissibility of the level of force applied for the purpose of preventing escape depends on the motivation for the attempted escape.

maneuver. The court concludes that the third <u>Graham</u> factor weighs against Phelps and in favor of Holliman.

Although the first and second <u>Graham</u> factors favor Phelps and the use of "minimal" force, the court concludes that the third <u>Graham</u> factor weighs heavily in Holliman's favor and allowed the use of "*some*" force. <u>Perea</u>, 817 F.3d at 1203 (emphasis in original). The court further concludes that no reasonable jury could conclude that the "leg sweep" was not reasonable and proportionate under the circumstances.

The court recognizes that the Tenth Circuit has said that the second <u>Graham</u> factor is "undoubtedly the most important" in determining "the objective reasonableness of an officer's use of force." <u>Wilkins</u>, 33 F.4th at 1273 (quotation marks and citation omitted). And that factor, along with the first factor, cuts in favor of finding that only "minimal" force was to be used. However, again, the third <u>Graham</u> factor weighs heavily in favor of Holliman, and the "leg sweep" maneuver Holliman performed was reasonable and proportionate to Phelps' conduct. Consequently, with respect to the "leg sweep" maneuver, the court concludes that Holliman's actions were objectively reasonable, and Phelps was not subjected to an unreasonable seizure under the Fourth Amendment. It follows that Phelps has not satisfied his burden under the first prong of the qualified immunity test–a reasonable jury could find facts supporting a violation of his Fourth Amendment right to be free of the use of excessive force. With this finding, the court need not address whether Phelps has satisfied his burden under the second prong of the qualified immunity test–the right was clearly established at the time of the constitutional violation. The court concludes that Holliman is entitled to qualified immunity on Phelps' § 1983 use of excessive force claim with respect to the "leg sweep" maneuver in the hospital parking lot. Holliman's motion will be granted as to this claim.

28

3. Whether Phelps' Fourth Amendment right to be free from use of excessive force (the "hip toss" maneuver) was clearly established at the time of the incident

The court, as discussed, concludes that with respect to the "hip toss" maneuver in the Dibble Police Department, Phelps has satisfied his burden under the first prong of the qualified immunity test–a reasonable jury could find facts supporting a violation of his Fourth Amendment right to be free from the use of excessive force. The court therefore turns to whether Phelps has satisfied his burden under the second prong of the qualified immunity test–the right was clearly established at the time of the constitutional violation. The court concludes he has.

In his briefing, Phelps relies in part upon the Tenth Circuit's decision in Perea v. Baca. There, the Tenth Circuit specifically stated, "it is–and was [in 2011]–clearly established that the use of disproportionate force to arrest an individual who is not suspected of committing a serious crime and who poses no threat to others constitutes excessive force." 817 F.3d at 1204. In Perea, officers were sent to perform a welfare check on the plaintiff after he was involved in a verbal fight. *Id.* at 1201. They were informed that no weapons were involved but that the plaintiff "suffered from mental illness" and "may have been on drugs." *Id*. When they arrived at the home, they were informed the plaintiff "was acting up" and he had recently left on his bicycle. *Id*. Thereafter, the officers briefly chased the plaintiff, during which the plaintiff violated city traffic ordinances. The officers "pushed [the plaintiff] off his bicycle," and the plaintiff "struggled and thrashed while holding a crucifix." *Id*. at 1201. After the plaintiff began struggling, one of the officers tased the plaintiff, and when that proved ineffective, he tased him nine more times, for a total of ten times in less than two minutes. The Tenth Circuit decided that the three Graham factors weighed against the officers' use of force because (1) the plaintiff's

minor offense "supported the use of minimal force[;]" (2) the plaintiff was not a danger "to anyone other than himself before they attempted to effect an arrest[;]" and (3) while the officers were entitled to use "*some* force during the period in which [the plaintiff] was resisting," the actual force the officers used was not reasonable and proportional. *Id*. at 1203 (emphasis in original). The court concludes that <u>Perea</u> puts any reasonable officer in Holiman's position on notice that force should not be used on a non-violent or non-threatening suspect unless that suspect is actively resisting, and even then, the force used should be no more than is necessary to get the suspect under the officer's control.

Phelps also cites the Tenth Circuit's decision in <u>McCoy v. Meyers</u>, 887 F.3d 1034, 1052 (10th Cir. 2018), wherein the appellate court stated that it was "clearly establish[ed] that the Fourth Amendment prohibits the use of force without legitimate justification, as when a suspect poses no threat or has been subdued." In so stating, the Tenth Circuit relied upon its decisions in <u>Dixon v. Richer</u>, 922 F.2d 1456 (10th Cir. 1991); <u>Casey v. City of Federal Heights</u>, 509 F.3d 1278 (10th Cir. 2007); and <u>Weigel v. Broad</u>, 544 F.3d 1143 (10th Cir. 2008). *See*, <u>McCoy</u>, 887 F.3d at 1052.

The court takes its cue from a common-sense application of <u>Graham v. Connor</u> and the Tenth Circuit's excessive force cases, cited above, as well as <u>Morris v. Noe</u>, also cited in Phelps' brief, all of which were decided before the events before the court in this case occurred. The court refers here to common sense because, as might be expected, no one case presents the same constellation of facts supporting or undermining the claim of excessive force, or, relatedly, the claim of immunity. In <u>Morris</u>, a § 1983 takedown case in which denial of qualified immunity was affirmed, the Tenth Circuit (noting that it had found no cases addressing "a forceful takedown that by itself caused serious injury," 672 F.3d at 1197) recognized that:

> Because the existence of excessive force is a fact-specific inquiry, however, there will almost never be a previously published opinion involving exactly the same circumstances. Thus, we have adopted a sliding scale: The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.

*Id.* at 1196 (quotation marks and citation omitted); *accord*, Perea, 817 F.3d at 1204.

In any given case, some of the recognized factors will, as a matter of common sense, be more prominent than others. For instance, in Graham v. Connor, as well as in Tenth Circuit cases decided before the events in this case took place, it was made clear that the presence of an "immediate threat" (and the level of that threat) to officer safety is a potentially decisive factor. Graham, 490 U.S. at 396; Morris, 672 F.3d at 1196. In the case at bar, not only did Phelps not pose an immediate threat to Holliman as they moved toward the door, the converse was true: Phelps was essentially defenseless to a maneuver intended to forcefully propel his head to the floor of the station. To determine whether "obvious[] egregious[ness]," Morris, 672 F.3d at 1197, should influence the court's analysis of Holliman's claim of immunity, the court looks to the "totality of the circumstances," Graham, 490 U.S. at 396. These circumstances–including Holliman's conscious decision as to the level of force needed to regain control of a handcuffed man within the controlled setting of a police station–move the needle toward the egregious end of the scale. In the absence of a white horse case, a bay horse case will do. *See*, Lowe, 864 F.3d at 1210 ("When the public official's conduct is egregious, even a general precedent would apply with obvious clarity.").

In sum, the court concludes that Phelps has satisfied his burden on the second prong of the qualified immunity test–the right was clearly established at the time of the constitutional violation. Because Phelps has satisfied his burden on the first and

second prongs of the qualified immunity test, the court concludes that Holliman is not entitled to summary judgment with respect to Phelps' § 1983 use of excessive force claim based on the "hip toss" maneuver in the Dibble Police Department.

Retaliation Claim–First Amendment

1. Whether Holliman violated Phelps' First Amendment rights by using the "leg sweep" outside the hospital

To establish a First Amendment retaliation claim, a plaintiff must show that (1) "he engaged in activity the First Amendment protects;" (2) "[Holliman's] actions injured him in a way that would 'chill a person of ordinary firmness from continuing to engage in that activity';" and (3) "his protected activity substantially motivated [Holliman's] responsive actions." Frey v. Town of Jackson, Wyoming, 41 F.4th 1223, 1232 (10th Cir. 2022) (quoting Nielander v. Bd. of Cnty. Comm'rs, 582 F.3d 1155, 1165 (10th Cir. 2009)). Upon review, the court concludes that Phelps has failed to proffer evidence sufficient to enable a reasonable jury to find in his favor as to the first and third elements. In light of this finding, the court need not address whether Phelps has proffered evidence sufficient to satisfy the demands of the second element.

With respect to the first element, the court agrees with Phelps that "the First Amendment protects the right to criticize the police[.]" Jordan, 73 F.4th at 1169. However, "the right to criticize police has important limits." Id. at 1170. "[I]f criticism is accompanied by a physical act which interferes with an officer's official duties, then the officer may take measures to stop that physical act." Id. (citation omitted). In the case at bar, although the evidence, viewed in Phelps' favor, reveals that Phelps was–to put it mildly– critical of Holliman's conduct toward Phelps in the DPD, the evidence, as previously discussed, reveals that at the time Holliman performed the "leg sweep" maneuver, Phelps was trying to escape Holliman's

control and was actively resisting going with Holliman to his police vehicle and then to jail.  And as the court has already determined, the measure that Holliman took to regain control of Phelps was reasonable and proportionate to Phelps' conduct.  The court thus concludes that Phelps' criticism fell outside the bounds of First Amendment protection due to his physical acts constituting active resistance and attempts to escape control.

As to the third element, the court also concludes that even if Phelps engaged in protected activity, the evidence, viewed in Phelps' favor, does not support the proposition that the protected activity substantially motivated Holliman's actions.  A reasonable jury could not find that Holliman's actions were based on Phelps' criticism itself, rather, it was based upon Phelps' conduct in attempting to escape Holliman's control–actively resisting going with Holliman to the patrol car and then to the jail.  Holliman and Phelps struggled with each other on their feet for 12 seconds before Holliman executed the "leg sweep" maneuver.

In sum, the court concludes that Phelps has failed to satisfy his burden on the first prong of the qualified immunity test–that a reasonable jury could find facts supporting a violation of his First Amendment right to be free from retaliatory conduct (use of the "leg sweep" maneuver) for protected activity.

2.  <u>Whether Phelps' First Amendment right to be free from retaliatory conduct (use of the "leg sweep" maneuver) for protected activity was a clearly established right</u>

Even if Phelps were able to establish all the elements of his First Amendment retaliation claim, and thus, a constitutional violation, the court concludes that Phelps is unable to establish that the constitutional violation was clearly established in March, 2022.

In <u>Hoskins v. Withers</u>, 92 F.4[th] 1279 (10th Cir. 2024), the Tenth Circuit, relying on its decision in <u>Frey,</u> stated that there was an "absence of any case law that would clearly establish a First Amendment violation from the retaliatory use of force" as of November 2018. *Id*. at 1294. Phelps has not cited any decision that would show that as of March 2022, there was precedent finding a First Amendment violation when an officer uses force to retaliate for protected speech. "[B]ased on the absence of a clearly established protection against a retaliatory use of force," *id*. at 1294, the court concludes that Phelps has failed to carry his burden on the second prong of the qualified immunity test. This conclusion arguably seems a bit harsh, especially considering the fact that the court has given Phelps the benefit of a sliding scale approach with respect to the takedown at the Dibble police station. But Judge Bacharach's opinion for the unanimous Tenth Circuit panel in <u>Hoskins</u> is very plain spoken on this issue. He repeated, in a footnote, the holding that binds this court: There is "no clearly established protection against a retaliatory use of force." *Id.* at 1294 n. 14.

\* \* \* \*

Because Phelps has failed to satisfy his burden on both prongs of the qualified immunity test, the court concludes that Holliman is entitled to summary judgment on Phelps' First Amendment retaliation claim.

<u>State Law Negligence Claim</u>

The Town seeks summary judgment on Phelps' negligence claim under Oklahoma law based on Holliman's use of excessive force. In its motion, the Town argues that Phelps has "failed to demonstrate that Officer Holliman breached any legal duty to Plaintiff or that he was injured by such breach." Doc. no. 33, ECF pp. 6-7. However, the court has concluded that the "hip toss" maneuver utilized by Holliman was objectively unreasonable. Consequently, the court rejects the Town's

argument that Phelps has failed to demonstrate that Holliman breached any legal duty to him.  Further, based on the record evidence, viewed in Phelps' favor, the court rejects the Town's argument that Phelps has failed to demonstrate that he was injured by such breach.

In its motion, the Town also argues that "there is simply no evidence that Officer Holliman acted maliciously or outside the scope of his employment with regard to Plaintiff."  Doc. no. 33, ECF p. 6.  However, under the Oklahoma Governmental Tort Claims Act (Act), a political subdivision, like a municipality, "shall be liable for loss resulting from . . . the torts of its employees *acting within the scope of their employment* subject to the limitations and exceptions specified in the" Act.  51 O.S. § 153 (emphasis added); *see also*, Tuffy's, Inc. v. City of Oklahoma City, 212 P.3d 1158, 1167 (Okla. 2009) ("[A] municipality is liable for the tortious acts of police officers committed within the scope of employment as defined by the [Act].  Such tortious acts include abuses of lawful power by police officers.  Whether a police officer's actions were taken within the scope of employment is a jury question unless only one reasonable conclusion can be drawn from the facts alleged.)".  Thus, it is of no consequence that there is no evidence that Holliman acted maliciously or outside the scope of his employment.

In sum, the court concludes that the Town is not entitled to summary judgment on Phelps' negligence claim.

## IV.

### *Conclusion*

For the reasons stated, Defendant John Daniel Holliman's Motion for Summary Judgment (doc. no. 32) is **GRANTED in part** and **DENIED in part**.  Holliman's motion is **GRANTED** with respect to plaintiff Craig Allen Phelps' 42 U.S.C. § 1983 use of excessive force claim based upon the use of a "leg sweep"

maneuver outside the Norman Regional Hospital and with respect to his 42 U.S.C. § 1983 retaliation claim, and it is **DENIED** with respect to his 42 U.S.C. § 1983 use of excessive force claim based on the "hip toss" maneuver in the Dibble Police Department.  Defendant Town of Dibble's Motion for Summary Judgment (doc. no. 33) with respect to plaintiff Craig Allen Phelps' negligence claim is **DENIED**.

IT IS SO ORDERED this 27th day of January, 2025.

STEPHEN P. FRIOT
UNITED STATES DISTRICT JUDGE

23-0755p011.docx